Clinchmore Coal Mining Co. v. Commissioner.
Clinchmore Coal Mining Co. v. Comm'r
Docket No. 101741. United States Tax Court
1943 Tax Ct. Memo LEXIS 194; 2 T.C.M. (CCH) 462; T.C.M. (RIA) 43345; July 17, 1943
*194 George E. H. Goodner, Esq., Munsey Bldg., Washington, D.C., for the petitioner. Geo. H. Mitchell, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion This case arises on respondent's determination of a deficiency in petitioner's unjust enrichment tax for the years 1935 and 1936, in the sums, respectively, of $767.23 and $1,450.41. Two questions are raised, (1) Whether Title III of the Revenue Act of 1936, laying a tax on unjust enrichment, is unconstitutional; and (2) the questions, (a) whether a computation of the burden shifted by the taxpayer to others, made pursuant to section 501(e)(1) by adding to the cost of the articles "the average margin with respect to the quantity involved" and deducting the sum from the sale price, created the presumption that the entire burden of the tax imposed upon the petitioner by the unconstitutional Bituminous Coal Conservation Act of 1935, 993-4, and not paid by the petitioner, had been shifted to others; and (b) whether petitioner has overcome the above rebuttable statutory presumption that the burden of the Federal excise was shifted to others? Findings of Fact Petitioner is a corporation engaged in the mining and selling *195 bituminous coal. Its tax returns were filed with the collector of internal revenue for the district of Tennessee. The Bituminous Coal Conservation Act of 1935, popularly called the "Guffey Act", imposed an excise tax of 15 percent upon the sale of coal, but remitted 90 percent of this tax provided the coal-miner complied with a code regulating the conduct of its business. Petitioner so complied and the tax applicable to it was, therefore, laid at the rate of 1 1/2 percent of the sale price of coal at the mine. The tax imposed by the Guffey Act became effective on November 1, 1935. The Act had become effective on August 30, 1935. The Guffey coal tax was declared unconstitutional by the Supreme Court on May 18, 1936, in the case of Carter v. Carter Coal Co., et al., 298 U.S. 238. The tax which was so imposed upon petitioner but not paid by it by reason of the pending controversy on its constitutionality, was computed as follows: TAX IMPOSED BUT NOT PAID
Year Ended Decem-
Tax
Amount
ber 31, 1935
Sales
Rate
Tax
November 1935
$ 39,119.83
$ .015
$ 586.80
December
44,388.76
.015
665.83
Total for 1935
$ 83,508.50
$ .015
$1,252.63
Year Ended Decem-
ber 31, 1936
January 1936
$ 48,314.29
$ .015
$ 724.71
February
54,955.80
.015
824.34
March
21,186.26
.015
317.79
April
33,756.62
.015
506.35
May 1-18, Incl.
24,267.78
.015
364.02
Total for 1936
$182,480.75
$ .015
$2,737.21
Total for 1935
and 1936
$265,989.34
$ .015
$3,989.84
*196 The above figures were computed on the sale price of petitioner's agent, Southern Coal & Coke Co., Inc., the net price to petitioner being 8 percent less, after the deduction of the agent's commission. Petitioner's total coal sales for November 1935 were $39,446.08, not $39,119.83. as computed by respondent. The following schedule shows the tons sold, total prices received and prices received per ton of petitioner's coal for the years and months indicated, to wit: Tons Sold
Sales
Average
(not includ-
(not includ-
Sale
Month and Year
ing house
Total
ing house
Total
Price
sales)
Sales
sales)
Sales
Per Ton *
September 1934
11,520
11,520
$27,673.10
$27,834.75
$2.393
October
13,020
13,020
31,687.23
31,976.88
2.434
November
13,806
13,806
33,079.32
33,383.38
2.396
December
15,830
15,830
38,749.16
39,095.52
2.448
January 1935
16,925
17,145
41,313.73
41,678.36
2.441
February
14,750
14,923
36,155.06
36,524.69
2.451
March
13,743
13,877
32,799.29
33,138.26
2.387
April
6,174
6,292
13,707.59
13,981.99
2.220
May
10,208
10,538
21,564.23
21,833.83
2.112
September
10,265
10,265
23,285.68
23,611.68
2.268
October
November
14,898
14,898
38,711.80
39,446.08
2.598
December
17,492
17,708
43,924.51
44,388.76
2.511
January 1936
18,930
19,091
47,887.04
48,314.29
2.530
February
20,230
20,467
54,506.68
54,955.80
2.694
March
8,727
8,833
20,796.38
21,186.26
2.383
April
14,887
15,096
33,392.90
33,256.62
2.243
May
18,597
18,632
39,147.06
39,471.56
2.105
*197 The above figures represent the sale prices of petitioner's agent. The tons mined and labor costs for the following-named periods, composed of the various months included in each period, are set out in the following table. The labor cost per ton for each month is set out in the column opposite for the month; the labor cost per ton for each period is set out in the column opposite the word "Total" for each period; and each figure representing labor cost per ton is the quotient of labor cost for each month or period, as the case may be, divided by the number of tons attributable to it: JULY 1935 - SEPTEMBER 1935, INCLUSIVE
Labor Cost
Month and Year
Tons Mined
Labor Cost
Per Ton
July 1935
12,279
$ 16,619.41
$1.353
August
8,928
13,268.56 1.486
September
9,831
12,816.50 1.304
Total
31,038
$ 42,704.47
$1.37588(Average)
NOVEMBER 1935 - JANUARY 1936, INCLUSIVE
Labor Cost
Month and Year
Tons Mined
Labor Cost
Per Ton
November 1935
15,620
$ 23,681.03
$1.516
December
17,358
23,056.80 1.328
January 1936
19,156
25,004.44 1.305
Total
52,134
$ 71,742.27
$1.37611 (Average)
*198 NOVEMBER 1934 - MAY 1935, INCLUSIVE
Labor Cost
Month and Year
Tons Mined
Labor Cost
Per Ton
November 1934
12,977
$ 16,869.97
$1.299
December
15,611
19,040.58 1.220
January 1935
16,658
20,594.70 1.236
February
14,673
18,071.49 1.232
March
14,170
17,245.85 1.217
April
5,832
8,424.38 1.444
May
9,802
13,545.20 1.382
Total
89,723
$113,792.17
$1.26826 (Average)
NOVEMBER 1935 - May 1936, INCLUSIVE
Labor Cost
Month and Year
Tons Mined
Labor Cost
Per Ton
November 1935
15,620
$ 23,681.03
$1.516
December
17,358
23,056.80 1.328
January 1936
19,156
25,004.44 1.305
February
20,918
24,431.54 1.168
March
9,298
13,703.97 1.474
April
15,329
20,040.60 1.307
May
17,101
23,814.10 1.393
Total
114,780
$153,732.48
$1.33937 (Average)
Southern Coal & Coke Co., Inc., had an exclusive contract to sell all petitioner's coal, paying petitioner Southern Coal's sale price, less its 8 percent commission. Approximately 20 percent of the coal sold by petitioner during the tax period was sold under contracts in which a sale price was set out. The contracts all contained clauses that they were subject to wage increases, that *199 is, the increased cost incurred by petitioner on account of a wage increase might be added to the contract price. They also contained clauses that Federal excise taxes might be added to the price named in the contracts. The remaining 80 percent of sales were so-called "spot" sales, made at the prevailing market price. An increase of $.15 per ton on account of a wage increase was made to all contract vendees of the petitioner beginning November 1935. The contracts could be cancelled by either party on 30-days notice, but the evidence does not show whether any diminution of this wage increase was made in the taxable period. There was an increase per ton in the sale price of petitioner's coal in the months of November 1935, December 1935, January 1936, February 1936 and March 1936 over that of September 1935, which varied as indicated in the following table. These figures were computed by respondent on the basis of sales which did not include "house sales". November 1935 over September 1935
$.330
December 1935 over September 1935
.243
January 1936 over September 1935
.262
February 1936 over September 1935
.426
March 1936 over September 1935
.115 The average sale price *200 per ton was in April and May 1936 less than that in September 1935, reckoned on the same basis as above, as follows: April 1936 less than September 1935 by
$.025
May 1936 less than September 1935 by
.163
The average labor cost per ton ($1.37611) for the period including the months of November and December in 1935 and January in 1936, the first three months when the wage increase was in effect, was less than 1/4 of a mill in excess of the average labor cost per ton ($1.37588) for the three months preceding the wage increase, namely, July, August and September 1935. During the later period petitioner's coal mined increased by about 68 percent over that of the earlier period; and in periods when fewer tons were mined, the cost of mining was proportionately greater. The average labor cost per ton ($1.33937) for the tax period of November 1935 to May 1936, inclusive, was less than the average labor cost per ton ($1.37588) for the months of July, August and September 1935, the three months preceding the wage increase, by the sum of $.03651. The tonnage increase here of the later over the earlier period was about 270 percent, with a corresponding decrease in labor cost. The average *201 labor cost per ton ($1.33937) for the tax period of November 1935 to May 1936, inclusive, was $.07111 in excess of the average labor cost per ton ($1.26826) for the period November 1934 to May 1935, inclusive. In the later period the tonnage increased by about 28 percent over that of the earlier period. Petitioner's "net realization", or excess of sale price over cost was as follows for the period October to September, inclusive, in the taxable years 1935-1936, and in the corresponding months of the next preceding years 1934-1935: Average
Net
Mine
Average
Year
Realiza-
Operating
Margin
tion
Cost
Per Ton
Per Ton
Per Ton
Oct. 1934
to Sept. 1935
$2.1297
$1.6058
$0.5239
Oct. 1935
to Sept. 1936
2.1947
1.7255
0.4692
Difference in margin, or decrease
in net realization
.0547
*03*Difference in margin, or decrease in
to Sept. 1936 2.1947 1.7255 0.4692
Oct. 1935
to Sept. 1935 $2.1297 $1.6058 $0.5239
Oct. 1934 Per Ton Per Ton tion Cost Per Ton
Year Realiza- Operating Margin Net Mine Average Average For the statutory period of comparison, the six years next preceding the taxable year the net realization was as follows, taking into account only *202 those months of the year of greater sales, November to May, which correspond with the taxable months here involved. In these months higher prices were asked and greater sales were made. Clinchmore Coal Mining Co.
1
2
3
4
5
1-1-30 to
11-1-30 to
11-1-31 to
11-1-32 to
11-1-33 to
5-17-30
5-17-31
5-17-32
5-17-33
5-17-34
1. Tons Sold
31,870
67,105
48,521
68,163
52,516
2. Gross Sales
$ 66,736.46
$129,627.61
$ 79,228.61
$100,744.41
$118,966.40
3. Less: Commissions
4,770.39
9,450.93
6,204.82
8,005.55
10,796.57
4. Net Realization
$ 61,966.07
$120,176.68
$ 73,023.79
$ 92,738.86
$108,169.83
5. Realization per Ton1,82066
6. Tons Mined
31,804
68,582
49,651
67,976
53,320
7. Royalties
$ 3,180.41
$ 6,858.20
$ 4,960.17
$ 6,797.55
$ 5,331.99
8. Labor
31,784.19
78,011.73
52,615.69
62,239.54
63,451.47
9. Mine Supplies
3,109.11
8,864.64
6,237.78
8,042.36
7,155.58
10. Power (Fuel for Power House)
1,442.35
3,497.07
4,020.50
4,657.73
3,838.86
11. Mine Expense
1,201.43
1,008.18
930.56
1,073.90
1,170.24
12. Total
$ 40,717.49
$ 98,239.82
$ 68,764.70
$ 82,811.08
$ 80,948.14
13. Average Cost per Ton
14. Average Margin per Ton (Line 5 less line 13)
Average margin per ton Nov. 1, 1935 to May 17, 1936
Average margin per ton Nov. 1, 1930 to May 17, 1935
Difference
*203 6
11-1-34 to
Total
5-17-35
Col. 1-6 incl.
1. Tons sold
87,652   355,827   2. Gross Sales
$209,775.87
$705,079.36
3. Less: Commissions
18,012.68
57,240.94
4. Net Realization
$191,763.19
$647,838.42
5. Realization per Ton $ 1.82066
6. Tons Mined
85,296   356.629   7. Royalties
$ 8,529.64
$ 35,657.96
8. Labor
107,675.16
395,777.78
9. Mine supplies
9,116.13
42,525.60
10. Power (Fuel for Power House)
5,275.67
22,732.18
11. Mine Expense
1,070.17
6,454.48
12. Total
$131,666.77
$503,148.00
13. Average Cost per Ton
$ 1.41084
14. Average Margin per Tone (Line 5 less line 13)
.40982
Average margin per ton Nov. 1, 1935 to May 17, 1936
$ .6431
Average margin per ton Nov. 1, 1930 to May 17, 1935
.4098
Difference
$ .2333
Opinion KERN, Judge: 1. The first question, of the constitutionality of Title III of the Revenue Act of 1936 need not detain us, for we have already sustained it in its application to taxes imposed by the so-called "Guffey Act" which were not paid by coal miners upon whom imposed. See Sportwear Hosiery Mills, 44 B.T.A. 1026, at 1034; and cases cited there; TennesseeConsolidated Coal Co., 46 B.T.A. 1035. *204 2. We turn now to the real question in issue, whether petitioner passed on the tax. The Statute by section 501 (a) 1, Revenue Act of 1936, lays the tax and by section 501 (e) 1 creates a presumption that the tax has been shifted to the extent by which the selling price exceeds the cost [1] plus "the average margin with respect to the quantity involved." "Margin" is defined by subsection (f) 1 [2] to mean "the difference between the selling price of articles and the cost thereof", and "average margin" to mean the same difference as to "similar articles sold by the taxpayer during his 6 taxable years preceding the initial imposition of the Federal excise tax in question," with exceptions not pertinent here. Section 501 (i) 1 and 2, [3] makes the presumption rebuttable. *205 Before discussing the proof of petitioner's shift of taxes, we should mention the objection raised by it to certain figures used by the respondent. Respondent has taken the gross sales of petitioner through the Southern Coal & Coke Co., instead of the petitioner's net sales after deduction of that company's 8 percent commission. Southern Coal had an exclusive right to sell petitioner's coal. The agreement of petitioner and Southern Coal is not in evidence, but an earlier contract, between petitioner and Appalachian Coals, Inc., made on January 25, 1932, was put in evidence, which is probably in all essential respects similar to the later agreement. It provides for sale by "the selling agent" on commission of a fixed percentage of "the gross selling price f.o.b. at the mines", and moreover the "agent" agrees to sell in the producer's markets and to its old customers and under the mine name and to maintain the good will of the producer. All of these facts, if the same conditions were continued, would indicate that Southern Coal was a mere agent of petitioner, acting solely on its behalf and in no sense a purchaser of the coal on its own account; and in the absence of any evidence to *206 the contrary we must continue that this was so. Obviously, if such was the case, petitioner was taxable on the gross sales, or in the language of the Guffey Act, "on the sale price at the mine" (Bituminous Coal Conservation Act of 1935; section 3, 49 Statutes at Large 993-4). We do not find that Norwood-White Coal Co., 45 B.T.A. 638, relied on by petitioner, supports a contrary conclusion. Respondent concedes that the petitioner did not add the tax to its invoices, but this is not enough to show that the tax was not shifted; nor is it sufficient that both petitioner's president and an officer of Southern Coal Co. testified that petitioner did not shift the tax. Congress has prescribed the test and such testimony does not excuse the petitioner from meeting the test laid down. Honorbilt Products, Inc. v. Commissioner, 119 Fed. (2d) 797. Proceeding to the ultimate question we find the salient facts to be that on or about the effective date of the so-called Guffey Coal Act imposing the tax in question the petitioner increased the price at which its coal was sold, that this increase was precipitated by an increase in labor *207 costs anticipated by petitioner as a result of a new contract executed by it and the Miners' Union which became effective at or about the same time, that the increase in the price per ton of petitioner's coal was considerably in excess of the amount of the actual increase in the labor costs per ton, that "the margin" as defined in the statute, for the months during which a tax was payable under the Guffey Coal Act was approximately $.23 per ton greater than "the average margin" for the corresponding months of the preceding six-year period, and that petitioner's net realization or net profit for the period during which the Guffey Tax was imposed was approximately equal to the average net realization or profit for the corresponding period of the next preceding year. Respondent in his argument on this issue stresses the facts that the sales prices of petitioner's product were increased substantially at the time when the tax became effective, that this increase was considerably in excess of any increase in labor costs (the ostensible reason for the price increase), and that petitioner's "margin" for the tax period months was greatly in excess of the "average margin" for the comparable *208 months of the preceding six years. Petitioner on the other hand stresses the fact that while the increase in the sales prices of its product was in excess of the actual increase of its labor costs, its other costs of production increased so that its net realization during the tax period months was not more than its net realization during the comparable months of the preceding year. We do not believe that this fact is sufficient to relieve petitioner from the tax here in question in view of the other facts disclosed by the record and the presumption raised by the statute on account of the excess of petitioner's margin during the tax period over the average margin of the comparable period during the preceding six years. The record does not show that this increase in petitioner's costs of production other than labor costs was anticipiated by petitioner or in any way entered into its calculations at the time the increases were made in the price of petitioner's products. At the time petitioner increased its prices there were two factors according to the record which would have increased petitioner's costs and which were known to the officers of petitioner who were responsible for this *209 price increase: (1) an increase in labor costs and (2) the tax in question. We are unable to conclude under the facts shown by the evidence herein and the presumption raised by the statute that petitioner did not pass on to its customers the burden of the tax in question. On this issue we decide in favor of respondent. Decision will be entered for respondent.
Footnotes
*. As computed by respondent without consideration of house sales included in other columns above.↩
1. SEC. 501 TAX ON NET INCOME FROM CERTAIN SOURCES. (e) For the purposes of subsection (a) (1), (2), and (3), the extent to which the taxpayer shifted to others the burden of a Federal excise tax shall be presumed to be an amount computed as follows: (1) From the selling price of the articles there shall be deducted the sum of (A) the cost of such articles plus (B) the average margin with respect to the quantity involved; or * * * ↩
2. (f) (1) The term "margin" means the difference between the selling price of articles and the cost thereof, and the term "average margin" means the average difference between the selling price and the cost of similar articles sold by the taxpayer during his six taxable years preceding the initial imposition of the Federal excise tax in question, except that if during any part of such six-year period the taxpayer was not in business, or if his records for any part of such period are so inadequate as not to furnish satisfactory data, the average margin of the taxpayer for such part of such period shall, when necessary for a fair comparison, be deemed to be the average margin, as determined by the Commissioner, of representative concerns engaged in a similar business and similarly circumstanced. ↩
3. SEC. 501. (1) Either the taxpayer or the Commissioner may rebut the presumption established by subsection (e) by proof of the actual extent to which the taxpayer shifted to others the burden of the Federal excise tax. Such proof may include, but shall not be limited to: (1) Proof that the change or lack of change in the margin was due to changes in factors other than the tax. Such factors shall include any clearly shown change (A) in the type or grade of article or materials, or (B) in costs of production. If the taxpayer asserts that the burden of the tax was borne by him while the burden of any other increased cost was shifted to others, the Commissioner shall determine, from the respective effective dates of the tax and of the other increase in cost as compared with the date of the change in margin, and from the general experience of the industry, whether the tax or the increase in other cost was shifted to others. If the Commissioner determines that the change in margin was due in part to the tax and in part to the increase in other cost, he shall apportion the change in margin between them. (2) Proof that the taxpayer modified contracts of sale, or adopted a new contract of sale, to reflect the initiation, termination, or change in amount of the Federal excise tax, or at any such time changed the sale price of the article (including the effect of a change in size, package, discount terms, or any other merchandising practice) by substantially the amounts of the tax or change therein, or at any time billed the tax as a separate item to any vendee or indicated by any writing that the sale price included the amount of the tax, or contracted to refund any part of the sale price in the event of recovery of the tax or decision of its invalidity; but the taxpayer may establish that such acts were caused by factors other than the tax, or that they do not represent his practice during the period in which the articles in question were sold.↩